946 F.2d 896
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Peter Richard TRIPP and Richard Alfred Fonseca, Defendants-Appellants,
 Nos. 91-5129, 91-5130.
 United States Court of Appeals, Sixth Circuit.
 Oct. 7, 1991.
 
 Before BOYCE F. MARTIN, Jr. and MILBURN, Circuit Judges, and JOINER, Senior District Judge*.
 PER CURIAM.
 
 
 1
 In these consolidated cases, defendants Richard Alfred Fonseca and Peter Richard Tripp appeal their jury convictions for wire fraud under 18 U.S.C. § 1343 and interstate transportation of securities knowing that they were stolen, converted or taken by fraud under 18 U.S.C. § 2314. For the reasons that follow, we affirm.
 
 
 2
 Both defendants raise the issues of (1) whether the district court's references to Rule 404(b) evidence as "prior bad acts" denied the defendants a fair trial; (2) whether the evidence was sufficient to show that defendants knew the securities were stolen, converted or taken by fraud as provided in 18 U.S.C. § 2314; and (3) whether the cumulative effect of any errors at the trial is sufficient to require reversal of defendants' convictions and remand for a new trial.
 
 
 3
 Additionally, the issues raised by defendant Tripp are (1) whether the district court abused its discretion in denying defendant's motion to transfer under Rule 21(b) of the Federal Rules of Criminal Procedure; and (2) whether the district court abused its discretion in admitting evidence under Federal Rule of Evidence 404(b). Defendant Fonseca raises the issue of whether the district court abused its discretion in denying his motion to sever his trial from that of his co-defendants. Also, both defendants raise an issue within their arguments that is not in their statement of the issues, viz., whether the district court "[b]y charging the jury that they must find that the defendant knew the checks were 'stolen, converted or taken by fraud,' [erred by creating] a distinct possibility that the jury's verdict was not unanimous on counts 61 to 79," the securities fraud counts.
 
 I.
 A. FACTS
 
 4
 Most of the facts in these consolidated cases are not contested. Rather, it is the inferences to be drawn from those facts which are contested. The government offered proof at the trial that defendants, along with others indicted with them including Laszlo Mihaly Grabecz, U.S. Pen and Office Products, Inc., and United Business Exchange ("UBE"), all California residents or companies, were guilty of wire fraud and interstate transportation of securities knowing that they were stolen, converted or taken by fraud, by engaging in a telemarketing scheme to defraud the Greeneville Publishing Company ("GPC") in Greeneville, Tennessee, of over $854,000. The scheme was allegedly accomplished by concealing kickbacks of $41,400 in cashier's checks and other gifts to Edith Malone, the company's head bookkeeper, to induce Malone to pay for office supplies that were priced from 200 to 800 percent higher than identical supplies available in Greeneville, Tennessee.[1] Malone arranged for payment of the office supplies with checks drawn upon accounts of GPC or its affiliates which were sent by her from Tennessee to defendants in California. Malone either signed checks without authority, forged the names of her superiors, or obtained their signatures by deception. GPC officials were entirely unaware of the kickbacks and gifts Malone received as an incentive to purchase the office supplies.
 
 
 5
 Defendants Richard Alfred Fonseca and Peter Richard Tripp were both deeply involved with the activities of U.S. Pen and UBE. After being a rock and roll musician and working for a telemarketing company, defendant Tripp and his partner, Laszlo Mihaly Grabecz,[2] started a telemarketing business of their own in 1979 or 1980. The record contains a 1983 Statement by Domestic Corporation filed on behalf of U.S. Pen, and the articles of incorporation for UBE filed in 1985. Both documents were filed in California. Although the record is not entirely clear, it appears that U.S. Pen merged into UBE at some point in 1985. Both companies may have existed simultaneously for a period of time. Tripp was a co-owner of both corporations. Defendant Fonseca had known and worked for defendant Tripp for ten years at the time of the trial.
 
 
 6
 In connection with his employment with UBE, defendant Fonseca called businesses across the United States, offered the person he dealt with a "premium" for ordering supplies, and took their orders. Defendant Tripp would later verify these orders by telephone. On every sale to Malone by Fonseca, defendant Tripp would call her the following day and verify the order.
 
 
 7
 GPC, the victim along with its affiliates, publishes The Greeneville Sun newspaper. The evidence shows that GPC primarily purchased its office supplies in Greeneville, Tennessee, and received a twenty percent discount from the list price on all supplies purchased from their Greeneville supplier, who could make deliveries within an hour. In the years 1983, 1984, 1987, 1988, and 1989, GPC purchased office supplies at a total cost of between $4,000 and $6,000 each year. According to the proof, only the president of GPC and his son, the co-publisher and chief operating officer, had authority to approve vendors for the purchase of office supplies.
 
 
 8
 Edith Malone did not have authority to order office supplies, and in 1986, she did not have authority to sign checks.[3] She processed all invoices for payment including the preparation of checks for an authorized signature. Malone testified that she was first contacted by someone from UBE in February 1985 and offered a gift if she would purchase a quantity of ink pens. According to Malone, she told the caller that she did not have the authority to place an order and that the person who did was out of the office. The caller, a female voice, insisted that she needed an answer, and Malone placed an order for ink pens at a cost of $66.55 for which she received gifts consisting of a digital watch and a ball point pen set.
 
 
 9
 In April 1985, a UBE sales person named Nick called Malone at which time she purchased ink pens at a cost of $133.10 and received a portable telephone. The next gift was a blender which was sent to Malone's home address in exchange for an order of ball point pens at a cost of $532.28.
 
 
 10
 The record shows that after these three initial purchases, all sales by UBE to Malone, with the possible exception of a December 20, 1985, sale, were initiated by calls from defendant Fonseca. The purchases and kickbacks or "premiums" are outlined in the following chart.
 
 
 11
 INVOICE TOTAL PMTS. TO CHECKS TO
DATE INVOICE EDITH MALONE U.S. PEN/U.B.E.
 AMOUNT
8/5/85 $1,499.47 Food Processor $1,499.47
------------------------------------------------
9/6/85 4,008.10 13" Color TV 2,140.28
 1,867.82
------------------------------------------------
10/23/85 4,901.76 Sony Stereo 2,741.75
 2,160.00
------------------------------------------------
11/21/85 10,889.93 $500 10,889.92
------------------------------------------------
12/20/85 27,547.20 $1,400 27,547.20
------------------------------------------------
1/29/86 80,438.92 $3,500 23,212.80
 Sony Stereo 57,226.12
------------------------------------------------
3/4/86 114,309.50 $2,500 18,576.00
 $2,500 13,003.20
 5,356.80
 77,373.50
------------------------------------------------
3/25/86 207,158.40 $4,000 57,273.60
 $4,000 42,405.12
 $3,000 45,233.28
 62,246.40
------------------------------------------------
5/7/86 236,639.76 $8,000 50,937.84
 $2,000 59,340.96
 Sony VCR & 60,587.52
 Video Camera 65,773.44
------------------------------------------------
6/5/86 166,298.40 $5,000 55,432.80
 $5,000 55,432.80
 55,432.80
------------------------------------------------
INVOICE
TOTAL: $853,691.44 $41,400.00 TOTAL: $853,691.42
 
 
 12
 These amounts were not contested by defendants. As earlier stated, after each purchase, defendant Tripp would contact Malone in order to verify her order. Defendant Tripp testified that he called Dun & Bradstreet to determine if GPC was capable of paying for the supplies.
 
 
 13
 All gifts on the chart were sent to Malone's home address, and the cashier's checks were sent to either Malone's home or to her attention at GPC. Malone testified that she advised defendant Fonseca that deliveries sent to her attention at GPC would be given to her without being opened. She also testified that when defendant Fonseca would call her on the telephone he would not ask her if she wanted to place an order. Instead, he would tell her that he had mailed invoices for certain merchandise and that she would be receiving a gift or cashier's check.
 
 
 14
 As noted in the chart, the invoices dated March 25, 1986, totaled $207,158.40, and cashier's checks totaling $11,000 were sent to Malone. Malone testified that she told defendant Fonseca that GPC did not need the supplies to which Fonseca replied that Malone had already been paid and she had to pay the invoices. Malone further testified that she was afraid if she did not pay the invoices Fonseca would call her employer. Thereafter, Malone prepared and forged four checks, each dated a week apart, and sent the checks to Fonseca with instructions to deposit one check each week.
 
 
 15
 In June 1986, defendant Fonseca sent Malone four additional invoices, each for $55,432.80, and two cashier's checks for $5,000 each. Malone returned the invoices to UBE. Defendant Fonseca then called and asked Malone why she had returned the invoices. Malone informed defendant Fonseca that GPC did not have enough money to pay the invoices. According to Malone, defendant Fonseca advised her that she had to pay at least three of the invoices, and that when the three were paid that "will be it," and he would not call her anymore.
 
 
 16
 Malone wrote three checks to UBE on June 9, 1986, and these were the last checks she sent to defendants. During the same month, the management of GPC noted cash shortages and arranged for an audit to be conducted. From the audit, they discovered the unauthorized payments to UBE. Shortly thereafter, packages from UBE were delivered to GPC even though they were addressed to Edith Malone's home address. After these discoveries, GPC's Gregg Jones contacted the FBI which interrogated Malone and obtained a confession. Payment was stopped on the last five checks before they were cashed. Malone pled guilty to an eleven-count indictment charging violations of 18 U.S.C. § 2314.
 
 
 17
 Before being fired by GPC, Malone agreed to cooperate with the FBI which tape recorded five conversations between her and defendant Fonseca. Defendant Fonseca would brief defendant Tripp after every conversation, according to Tripp's testimony. Malone advised Fonseca that payment was stopped on the checks because there was a new controller at the newspaper who was checking all the records. Defendant Fonseca asked Malone, "could we slip those three in there real quick?" and said, "we want to protect you--a hundred percent. Please give us a hand on this end." Defendant Fonseca pleaded with Malone to see that the invoices were paid. Fonseca repeatedly reminded Malone that she had been paid $10,000 for the invoices and stated that "they're [the management of UBE, namely defendant Tripp] gonna want a return of some of that money in any event. Particularly the ten thousand."
 
 
 18
 The final conversation recorded was on July 8, 1986, when Fonseca told Malone that management had decided to give her until August 15, 1986, to make the two checks good or Malone would have to return $15,000 to them. Fonseca then told Malone that they would send a letter requesting return of the $15,000 and that
 
 
 19
 I need to hear from you because, they'll send a letter requesting that and it'll be addressed to, probably either yourself or, if it gets in the wrong hands, God knows what'll happen. I don't want that to take place. Again, I cannot emphasize enough, I nor they, management, want that 'fifteen' back.
 
 
 20
 (Emphasis added).
 
 
 21
 The proof shows that most of the supplies never reached GPC. The only supplies used by GPC were the first two orders and two or three boxes of "post-it notes." Some of the supplies were shipped to Malone's home, but most of the supplies were not shipped at all. Malone testified that she told defendant Fonseca that GPC was under construction, that they did not have room for the supplies, and that the supplies should be sent to her home. The remaining supplies that were not shipped were allegedly "stored" by the defendants at their distribution center after Malone complained that she had no more room at her home to store the supplies. Approximately two months before the trial, 28,600 pounds of office supplies were shipped to GPC and were rejected.
 
 
 22
 Tripp purchased cashier's checks for Malone in the following amounts: $500, $1,400, $3,500, $2,500, $2,500, $8,000, and $2,000. The other cashier's checks sent by UBE to Malone were purchased by defendant Grabecz. At the trial defendant Tripp admitted that although he knew the invoices were being paid with funds from GPC, he arranged for the cashier's checks to be payable to Malone.
 
 
 23
 Under Federal Rule of Evidence 404(b), the government offered proof of a similar pattern or scheme defendants conducted with other businesses. Former employees from seven different companies scattered throughout the United States testified that they personally received gifts and/or cashier's checks in exchange for purchasing supplies from U.S. Pen and/or UBE. In each instance, the company (employer) was not informed of the gifts or checks which were sent to the employees' home addresses. Four of the seven witnesses testified that they dealt with defendant Fonseca. Two of the witnesses testified that they were threatened that their employers would be informed of the gifts they received if they stopped buying supplies from UBE or U.S. Pen.
 
 
 24
 In this case, defendants argued that Malone was the true culprit and that the defendants lacked the intent to defraud. Defendant Tripp testified that he never intended to defraud GPC, but defendant Fonseca did not testify or call any witnesses.
 
 B. PROCEDURAL HISTORY
 
 25
 On March 30, 1989, a seventy-nine count indictment was filed in the Eastern District of Tennessee. The indictment charged the defendants with mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and interstate transportation of securities stolen, converted or taken by fraud (18 U.S.C. § 2314). On September 27, 1989, a superseding indictment was filed,[4] but on March 6, 1990, the district court dismissed counts one through twenty-six at the government's request. The trial began in this case on September 10, 1990, and continued until September 18, 1990, when the jury began deliberating. On September 20 the government moved to dismiss five counts, and the district court granted the motion.
 
 
 26
 After the jury deliberated for over three days, it returned its verdict on September 20, 1990, as to both defendants. Although the jury was unable to reach a verdict as to defendant Fonseca on counts 33, 35, and 37, it found him guilty on the remaining counts, viz., 39, 41, 43, 45-57, and 59-79. Defendant Fonseca was sentenced on December 21, 1990, to 60 months imprisonment on Counts 39, 41, 43, 45-57, 59 and 60 to run concurrently. He received 12 months imprisonment on Counts 61-70 to run concurrently but consecutively to the previous counts. He also received a sentence of five years probation on Counts 71 to 79 to be served consecutively to his sentences of imprisonment and was ordered to pay restitution to GPC in the amount of $233,185.54.
 
 
 27
 As to defendant Tripp, the jury was unable to reach a verdict as to certain counts, but he was found guilty in connection with the wire and securities fraud charged in Counts 39, 41, 43, 45-57, 59-60, 61-70, and 71-79. Defendant Tripp was sentenced to a term of 60 months imprisonment to run concurrently on Counts 39, 41, 43, 45-57, and 60. He was also sentenced to 36 months imprisonment on Counts 61, 62, 63, 64, 65, 66, 67, 68, 69, and 70 to run concurrently to each other and consecutively to the sentence imposed on Counts 39-60. Defendant Tripp was placed on probation for a term of five years to run consecutively to the sentence imposed on Counts 39-70 and to run concurrently as to Counts 71, 72, 73, 74, 75, 76, 77, 78, and 79.
 
 
 28
 It should be noted that as the offenses occurred prior to November 1, 1987, the defendants were not sentenced under the new sentencing guidelines. Timely notices of appeal were filed by both defendants in these consolidated cases.
 
 II.
 A. Motion to Transfer
 
 29
 Defendant Tripp appeals the district court's denial of his motion to transfer pursuant to Rule 21(b), Federal Rules of Criminal Procedure, claiming that he was denied a fair trial and due process. Tripp requested that the trial be transferred from the Eastern District of Tennessee to the Central District of California where he lived and had his business. Defendant's motion to transfer was repeated after he was indicted in California for tax fraud. Defendant's motions were denied by the magistrate judge.
 
 
 30
 The decision to transfer is within the district court's discretion, and the district court will not be reversed without a showing of abuse of discretion. United States v. Bittner, 728 F.2d 1038, 1041 (8th Cir.1984). The burden is on the defendant to show that a transfer would serve the purposes set forth in Federal Rule of Criminal Procedure 21(b). 2 Charles Alan Wright, Federal Practice and Procedure: § 344 at p. 266 (1982). In determining the most convenient venue for the parties and witnesses and the venue which satisfies the interest of justice, the court should examine all the circumstances of the particular case. Id. at p. 267.
 
 
 31
 After considering the briefs and record herein, we affirm the district court on this issue based upon the magistrate judge's excellent memorandums and orders dated December 7, 1989, and September 7, 1990, and agree that the circumstances of this case weighed in favor of having the trial in Tennessee. Although Tripp resided in California where his business was located, he conducted business with Malone in Tennessee for over a year. Defendant Tripp did not dispute at trial that he and his salesmen telephoned Malone in Greeneville, Tennessee, from February 1985 through June 1986 with offers of gifts and money to induce her to order office supplies. Defendants sought this business and as a result of it received checks totaling $853,691.42. Moreover, the victims as well as the government's most significant witnesses were in Tennessee. In opposition to the motion to transfer, the government filed eight affidavits with the court which explained in "concrete terms" that its witnesses would be greatly inconvenienced if the case were transferred to California. In contrast, defendant Tripp relied on only two affidavits of counsel and gave no real details about how failure to transfer this case would affect the lives of the proposed witnesses.
 
 B. Motion to Sever
 
 32
 Defendant Fonseca appeals the district court's denial of his motion to sever. Defendant Fonseca argues that he was prejudiced by the spillover effect of the evidence presented to convict his co-defendant.
 
 
 33
 The district court's ruling on a severance issue is reviewed for abuse of discretion. See, e.g., United States v. Swift, 809 F.2d 320, 322 (6th Cir.1987); United States v. Fischl, 797 F.2d 306, 313 (6th Cir.1986). In order to obtain reversal on appeal, a defendant has the " 'heavy burden of showing specific and compelling prejudice resulting from a joint trial which can be rectified only by separate trials.' ... [T]he error requires reversal only 'if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict.' " United States v. Davis, 809 F.2d 1194, 1207 (6th Cir.) (quoting United States v. Dempsey, 733 F.2d 392, 398 (6th Cir.), cert. denied, 469 U.S. 983 (1984)), cert. denied, 483 U.S. 1007 (1987); see United States v. Stull, 743 F.2d 439, 446 (6th Cir.1984), cert. denied, 470 U.S. 1062 (1985).
 
 
 34
 Federal Rule of Criminal Procedure 8(b) provides that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in ... the same series of acts or transactions constituting an offense or offenses." A series is a group of acts or transactions which are "logically interrelated," that is, are "the acts or transactions ... part of a common scheme or plan." United States v. Johnson, 763 F.2d 773, 776 (6th Cir.) (citations omitted), cert. denied, 474 U.S. 862 (1985). Federal Rule of Criminal Procedure 14 allows relief from prejudicial joinder through severance of the defendants or counts. In this case where aiding and abetting under 18 U.S.C. § 2 was part of the charge, the district court found that this case involved a scheme which was common to all the defendants.
 
 
 35
 The evidence that defendant Fonseca claims prejudiced him was the evidence admitted under Federal Rule of Evidence 404(b) relating to the scheme to defraud. The district court allowed the 404(b) evidence to be introduced as relevant to the issue of whether or not the defendants had both the requisite intent and knowledge to be convicted. However, the court ruled that only that "threat" testimony where the alleged threats were made by defendant Fonseca would be admissible.
 
 
 36
 Four of the seven 404(b) witnesses testified that they dealt with defendant Fonseca, but three of them did not state that the salesperson they spoke with was defendant Fonseca. One of those three testified that the salesperson she spoke with asked to speak with her boss when she cancelled an order. A second witness testified that she argued with Fonseca after she told him she was not going to order any more supplies, and that Fonseca told her he was going to tell her employer. Defendant Fonseca claims that on cross-examination it was established that he was not the salesperson who "threatened" this witness. However, the record does not support his contention. Regardless, this would be a factual issue for the jury to determine.
 
 
 37
 Defendant claims that this "threat testimony" was improper because the witness did not name Fonseca as the salesperson. However, this evidence directly involves Fonseca and is probative of his own guilt. Fonseca cannot argue that this was "spillover" evidence. Even in those instances where Fonseca was not specifically named by the witness, the 404(b) evidence was offered to demonstrate the defendants' alleged common scheme or plan. The jury could reasonably find that defendant Fonseca was a part of the plan and had the requisite knowledge and intent to be guilty of both wire and securities fraud.
 
 
 38
 Defendant Fonseca also complains of spillover evidence involving the prices of the supplies, the value of the kickbacks or premiums, and the shipment of supplies. He contends that because he had no control over the prices, premiums or shipment of supplies which were controlled by management, this evidence prejudiced him. However, this evidence was not only relevant to show the culpability of the other defendants, it also showed the culpability of Fonseca. Although Fonseca did not set the prices, Fonseca was aware of the prices and without question was aware of the kickbacks. Accordingly, the jury could reasonably infer that defendant Fonseca was involved in and had knowledge of the scheme to defraud.[5] Therefore, the district court did not abuse its discretion in denying defendant Fonseca's motion to sever.
 
 C. Federal Rule of Evidence 404(b)
 
 39
 Defendants raise two issues regarding the district court's admission of evidence under Rule 404(b). Defendant Tripp appeals the district court's admission of the Rule 404(b) evidence, claiming that it constituted prejudicial error and an abuse of discretion. Both defendants Tripp and Fonseca appeal the district court's reference to Rule 404(b) evidence as "prior bad acts" claiming that the characterization of the evidence was "bad" violated their right to a fair trial.
 
 
 40
 First, regarding the district court's admission of evidence, the district court is to be given broad discretion in determining the admissibility of evidence under Rule 404(b). United States v. Fraser, 709 F.2d 1556, 1559 (6th Cir.1983); Hammann v. Hartford Accident and Indem. Co., 620 F.2d 588, 589 (6th Cir.1980); United States v. Czarnecki, 552 F.2d 698, 702 (6th Cir.), cert. denied, 431 U.S. 939 (1977). This court examines the record to determine if the district court abused that discretion. Czarnecki, 552 F.2d at 702.
 
 Federal Rule of Evidence 404(b) provides:
 
 41
 (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 42
 In determining admissibility, the district court must engage in a two-step process. First, the court must determine if the evidence is admissible for a proper purpose; second, the court must determine if the probative value of the evidence outweighs its potential prejudicial effects. United States v. Ismail, 756 F.2d 1253, 1259 (6th Cir.1985); United States v. Huddleston, 811 F.2d 974, 976 (6th Cir.1987), aff'd, 485 U.S. 681 (1988); see Fed.R.Evid. 403. "In ruling on the admissibility of 404(b) evidence, the district court engages in the same weighing and balancing that is used in making Rule 403 determinations." United States v. Jerkins, 871 F.2d 598, 604 n. 8 (6th Cir.1989).
 
 
 43
 The government charged the defendants with engaging in a scheme to defraud GPC by concealing the payment of bribes and kickbacks to Malone, an employee of GPC, to induce her to do business with the defendants. The government argues that at trial defendant Tripp did not dispute the following facts: that Fonseca called Malone at GPC and offered her gifts and money to induce her to order office supplies; the gifts were sent to Malone's home address and cashier's checks were sent either to her home address or to her attention at GPC; that none of the invoices reflected the payment of money and gifts to Malone; and that most of the cashier's checks paid to Malone were personally purchased by defendant Tripp. Defendant Tripp's defense at trial was that he was a legitimate businessman acting in good faith who was duped and deceived by Malone. Therefore, intent and knowledge were essentially the only contested issues in this case. In order to prove intent and knowledge, the government called witnesses from other businesses who had dealt with UBE's salespeople.
 
 
 44
 Defendant Tripp argues that these witnesses were not presented for a proper purpose because their testimony was dissimilar to the evidence presented by the government of the alleged scheme to defraud GPC. Two witnesses testified that a salesperson from U.S. Pen or UBE told them he either wanted to contact their boss or would contact their boss, and would inform their boss of the gifts they had received as an incentive for ordering supplies if they refused further invoices. The government suggests that no "threats" of this kind were made against Malone because she never told defendants that she was not going to order more supplies.
 
 
 45
 Defendant Tripp seems to argue that because the "threat" evidence should not have been admitted, then all the 404(b) evidence "failed the 'threshold inquiry' " regarding whether the evidence is being used for a proper purpose. Clearly this argument fails. The 404(b) evidence demonstrated that defendants intentionally and knowingly engaged in a common scheme to defraud companies by concealing the kickbacks that were given to those companies' employees. The "threat" evidence also served this purpose.
 
 
 46
 Defendant Tripp also argues that the district court did not reach the second step of balancing the probative value of the evidence against the danger of unfair prejudice. However, defendant Tripp does not state that he requested that the trial court put its balancing determination on the record. While a district court should make its balancing determination of probative value and prejudicial effect on the record, its failure to do so will not require reversal where the defendant failed to request balancing on the record and where appellate review determines that the evidence was properly admitted. United States v. Acosta-Cazares, 878 F.2d 945, 950-51 (6th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 255 (1989). Under the circumstances of this case, the district court did not commit reversible error by failing to set forth its balancing determination on the record.
 
 
 47
 Finally, defendant Tripp argues that the probative value of the evidence was substantially outweighed by danger of unfair prejudice. See Fed.R.Evid. 403. " 'Unfair prejudice,' as used in Rule 403, does not mean the damage to the defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." United States v. Mendez-Ortiz, 810 F.2d 76, 79 (6th Cir.1986), cert. denied, 480 U.S. 922 (1987).
 
 
 48
 This court has held that Rule 404(b) "is actually a rule of inclusion rather than exclusion, since only one use is forbidden and several permissible uses of such evidence are identified." United States v. Blankenship, 775 F.2d 735, 739 (6th Cir.1985). This "inclusionary" interpretation of the rule tends to find evidence of other crimes admissible "except when it proves nothing but the propensity of the defendant to engage in criminal conduct." 22 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239 at p. 432 (1978).
 
 
 49
 The government argues that the 404(b) evidence which was admitted was probative in proving intent and knowledge, and further argues that the evidence was necessary and proper to refute defendants' argument that the telephone calls from UBE to Malone involved an isolated case. We agree that the probative value of the 404(b) evidence outweighed its prejudicial effect, and no legitimate business person acting in good faith would have engaged in the business practices carried on by the defendants. The cases relied upon by defendant Tripp do not support a contrary conclusion.
 
 
 50
 Aside from an attack on the admission of the 404(b) evidence, both defendants argue that the district court's repeated references to 404(b) evidence as "prior bad acts" denied them a fair trial. Rule 404(b) does not contain the language "prior bad acts," but discusses "other crimes, wrongs, or acts." Immediately prior to the first 404(b) witness, the district court gave an instruction to the jury in which the district court repeated the reference to "prior bad acts" five times. However, the district court instructed the jury that "[w]hether those are bad acts in this case or not is for you all to determine."
 
 
 51
 Thereafter, before the final jury instructions, defense counsel requested that the district court not refer to the 404(b) evidence as "prior bad acts." This request was declined and the instructions contained the same language. Again, however, the district court instructed the jury that "[w]hether those are bad acts in this case or not is for you to determine." Given these cautionary instructions, we cannot say that the district court's reference to "prior bad acts" denied defendants a fundamentally fair trial. Moreover, the district court's error, if any, was harmless beyond a reasonable doubt in view of the overwhelming evidence of the defendants' scheme to defraud GPC.
 
 D. Sufficiency of the Evidence
 
 52
 Both defendants appeal on the grounds that there was insufficient evidence to prove beyond a reasonable doubt that they knew the securities were stolen, converted or taken by fraud as required under 18 U.S.C. § 2314. When the sufficiency of the evidence is challenged on appeal, the inquiry is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Gallo, 763 F.2d 1504, 1518 (6th Cir.1985), cert. denied, 475 U.S. 1917 (1986) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). This standard applies whether the evidence presented is direct or circumstantial because circumstantial evidence is entitled to the same weight as direct evidence in determining whether there is sufficient evidence to support a guilty verdict. Holland v. United States, 348 U.S. 121, 140 (1954); United States v. Thurston, 771 F.2d 449, 452 (10th Cir.1985).
 
 
 53
 Defendants argue that there was insufficient evidence to show that they had knowledge that the securities (GPC's checks) were stolen, converted, or taken by fraud. However, "[k]nowledge may be inferred from defendant's conduct and surrounding circumstances." United States v. Stack, 853 F.2d 436, 439 (6th Cir.1988). In viewing the evidence in the light most favorable to the government, we note that the government presented strong evidence from which the jury could find that defendants had knowledge that the GPC checks they received were obtained by fraud, i.e., the concealment of the payment of kickbacks to Malone to cause her to pay the defendants' invoices. Malone had informed the defendants that she was in charge of bookkeeping, handled all invoices, and wrote the checks. The defendants knew Malone was in a position to pay their invoices and was in fact paid to "protect" the invoices, and the government argues that defendants did not particularly care how she accomplished that task. We agree.
 
 
 54
 Defendant Tripp admitted that he knew his customer was GPC, yet his payments of the so-called "premiums," which included considerable cash, were made to Edith Malone personally. None of the invoices reflected the payment of gifts or money to Malone. The government argues that a rational jury could reasonably conclude that the defendants had knowledge that the management of GPC was unaware that Edith Malone was being paid money to obtain payment of defendants' invoices. Therefore, the evidence was clearly sufficient for a rational juror to reasonably conclude that defendants knew of the fraud being perpetrated on GPC by Malone, participating in their scheme in transporting checks to defendants in interstate commerce which she had stolen, converted or taken by fraud.
 
 
 55
 Both defendants make another argument which is distinct from the sufficiency of the evidence issue. The defendants argue that because the district court charged "the jury that they must find that the defendant knew the checks were 'stolen, converted or taken by fraud,' there was a distinct possibility that the jury's verdict was not unanimous on counts 61 to 79." Following the court's instruction on the elements of 18 U.S.C. § 2314, defendants did not make a special request for a different jury instruction and made no objection to the quoted instruction. However, the defendants argue that the district court's charge could possibly have resulted in a non-unanimous verdict. This argument is frivolous and involves pure conjecture. The district court did not err in its charge to the jury. See United States v. McPherson, 782 F.2d 66 (6th Cir.1986); United States v. Gullett, 713 F.2d 1203 (6th Cir.1983), cert. denied, 464 U.S. 1069 (1984).
 
 E. Cumulative Effect
 
 56
 Both defendants argue that the cumulative effect of all the errors is sufficient to require reversal and that a new trial should be ordered. In addition to the claimed errors already discussed, defendants argue that two additional errors occurred at trial.
 
 
 57
 The first of these "errors" occurred during the testimony of Roy Osborne who works for Pentel of America. Osborne testified that retail office supply operations in the Los Angeles area usually sold office supplies from 20 to 50 percent below the manufacturer's suggested retail price. On direct examination, he was asked, "[d]o you find retailers in the Los Angeles area selling standard office supplies at five to six times above list?" His response was, "No, sir. The only way you can sell five to six times above list is with a mask and a gun."
 
 
 58
 After the witness was excused, defense counsel moved for a mistrial because of the "mask and gun" comment. Both defendants claim that the "government knew that its witness would make this very prejudicial remark and asked the question anyway." The government denies this claim. However, the government did admit that it was not surprised by the testimony. The district court noted in the record that "[t]here wasn't any open laughter in the courtroom. There were maybe some smiles on a few jurors' faces. I didn't hear any laughter." The court also asked counsel if they wanted a special instruction to the jury, but defense counsel refused the offer. The court then instructed government counsel "that he was not to refer to that comment in a final argument or any other time during the trial of this case," and the court's instruction was fully complied with by counsel for the government.
 
 
 59
 The district court's decision not to grant a mistrial will not be overturned by this court without a showing of abuse of discretion. See United States v. Atisha, 804 F.2d 920, 927 (6th Cir.1986), cert. denied, 479 U.S. 1067 (1987).
 
 
 60
 Defendant Fonseca argues that the inference from the remark was that defendants are armed robbers. Although the remark reflected more directly on defendant Tripp who set the prices, defendant Fonseca argues that the remark also prejudiced him. In this connection, defendants admitted that their prices were high but insisted that their prices were legal. In his closing argument Tripp's counsel stated that "[maybe] the prices were obnoxious.... [but] there is no law that precludes that." Although some prejudice may have resulted to the defendants from the "mask and gun" remark, in view of the district court's offer to give a special or limiting instruction to the jury and its admonishing government counsel to make no further reference to the remark, the decision not to grant a mistrial was not an abuse of the court's discretion.
 
 
 61
 The second of the "errors" came from a former Internal Revenue Service agent, Phillip Robey. Robey was called as a witness for the government because he had conducted an interview of defendant Tripp in June of 1987 concerning the operation of U.S. Pen and UBE. During the course of the interview, Robey asked Tripp about "premiums" or "incentives" sent to customers for buying products from his company. Tripp told Robey that he never sent cash to prospective buyers. Counsel for Tripp, on cross-examination, attempted to distinguish between "cash" and "cashier's checks" in order to show that Tripp had not lied because he had not denied sending out cashier's checks. On redirect examination, in an attempt to establish that the agent was interested in both cash and cashier's checks, he was asked, "When you interviewed Mr. Tripp, what were you, why were you asking him about cash?" Robey gave a non-responsive answer:
 
 
 62
 I was trying to determine--I was working on a tax case. I was trying to determine any possible tax deductions, what the use of the cash was to put together a tax return.
 
 
 63
 After this response, defendants' counsel asked to approach the bench and counsel for defendant Tripp stated:
 
 
 64
 On behalf of all defendants, Your Honor, I move for a mistrial at this time. This agent has just referred to an independent tax investigation. He said he is working on a tax investigation working on a tax case. That is totally improper. I don't think Mr. Baxter intended to walk into it. I think this is an inexperienced agent. He walked straight into it. I have no fault with Mr. Baxter at all. That answer was not only unresponsive but it was bringing before the jury the possibility of separate independent criminal investigations. That is wrong--we can't have it.
 
 
 65
 (Emphasis added).
 
 
 66
 The district court advised defendants' counsel that it would give a cautionary instruction to the jury if defense counsel wished. Again, defendants' counsel requested that the court not give a cautionary instruction.
 
 
 67
 In support of their argument concerning the cumulative effect of claimed errors, defendants rely on United States v. Blanton, 520 F.2d 907 (6th Cir.1975). Blanton was charged with unlawful possession of firearms. During the course of the trial, the attorney for the government twice deliberately asked witnesses about the defendant's suspected involvement in a bank robbery. This court reversed the conviction because of the government's "deliberate injection of testimony concerning another wholly unrelated offense in which Blanton was allegedly involved." Id. at 910.
 
 
 68
 In this case, defendants now argue that the way in which the government phrased the question, given the fact that Robey had already testified that he was with the criminal investigation unit, was designed and calculated to cause a highly prejudicial result. However, the government argues that it did not act in bad faith and points out that defense counsel for Tripp acknowledged this.
 
 
 69
 The record does not demonstrate that the government intended to elicit the remark made by Robey. Therefore, we cannot say that the district court abused its discretion in denying a mistrial. This case is clearly distinguishable from Blanton. Furthermore, Robey's testimony was confusing, and it cannot be said with any certainty that the jury concluded from Robey's answer that defendant Tripp was under another criminal investigation.
 
 
 70
 With regard to the cumulative effect of the errors defendants allege, we are reminded that defendants are not guaranteed a perfect trial, but instead should receive a fundamentally fair trial. See United States v. Ashworth, 836 F.2d 260, 267 (6th Cir.1988). The defendants refused the district court's offer for cautionary or limiting jury instructions on two occasions when they had requested a mistrial. The failure to pursue such an instruction reduces the validity of the assertion that the "testimony was so egregious that it constituted major prejudice...." United States v. Whitley, 734 F.2d 1129, 1135 (6th Cir.1984). Arguments of cumulative error must be kept in perspective. "We must guard against the magnification on appeal of instances which were of little importance in their setting." Glasser v. United States, 315 U.S. 60, 83 (1942), quoted in Ashworth, 836 F.2d at 268. In this case, defendants received a fundamentally fair trial, and the district court did not abuse its discretion in denying the motions for a mistrial.
 
 III.
 
 71
 For the reasons stated, we AFFIRM the district court in all respects.
 
 
 
 *
 Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Other evidence indicated that U.S. Pen and UBE's prices were five to six times above the national list price
 
 
 [2]
 Grabecz was indicted along with defendant Tripp, defendant Fonseca, Christopher Michael Fonseca, U.S. Pen, and UBE. Grabecz jumped bail, was severed from the case and a warrant was issued for his arrest
 
 
 [3]
 The record is unclear on Malone's authority to sign checks. Part of the record indicates that she had no authority to sign checks. However, elsewhere in the record it appears that in 1985 and part of 1986 she did have this authority and did sign some of the checks to U.S. Pen and UBE with her own signature. Whether she had authority to sign the checks or not is irrelevant to the government's theory based on the fact that the scheme to defraud was in the concealment of the kickbacks to Malone
 
 
 [4]
 Counts one through five charged defendants Tripp, Grabecz, Christopher Michael Fonseca (not in this appeal), and U.S. Pen with wire fraud and aiding and abetting, 18 U.S.C. §§ 2, 1343. Counts six through eleven charged defendants Grabecz, Tripp, Christopher Fonseca, and U.S. Pen with mail fraud and aiding and abetting, 18 U.S.C. §§ 2, 1341. Counts twelve through twenty-six charged defendants Grabecz, Tripp, Christopher Fonseca, and U.S. Pen with mail fraud and aiding and abetting, 18 U.S.C. §§ 2, 1341. These twenty-six counts were dismissed. Counts twenty-seven through sixty charged defendants Grabecz, Tripp, Richard Fonseca, U.S. Pen, and UBE with wire fraud and aiding and abetting, 18 U.S.C. §§ 2, 1343. Counts sixty-one through seventy-nine charged defendants Grabecz, Tripp, Richard Fonseca, and UBE with interstate transportation of securities converted and taken by fraud, and aiding and abetting, 18 U.S.C. §§ 2, 2314. On September 20, 1990, the government's motion to dismiss counts 29, 31, 33, 35 and 37 as to defendants Tripp and Richard Fonseca was granted
 
 
 [5]
 Defendant Fonseca makes further arguments regarding prejudice he allegedly suffered due to a "mask and gun" reference and a reference to a criminal tax investigation. These arguments will be addressed infra in part E