**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert D. FISCHL, Defendant-Appellant.**

No. 85–1297.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 7, 1986.

Decided July 30, 1986.

DAVID A. NELSON, Circuit Judge.

The appellant in this case, Mr. Robert Fischl, was indicted and tried with a fellow businessman, Mr. Charles Kerkman, for mail fraud and other offenses related to an alleged kickback scheme. A jury found Mr. Fischl guilty on six out of eleven counts, and he was fined, ordered to make restitution, sentenced to a year's imprisonment, and placed on probation for five years. On appeal he makes two contentions: (1) that he ought to have been acquitted because the kickback scheme was not intended to harm anyone, and the evidence thus could not support a finding that Mr. Fischl had the requisite intent to defraud, and (2) that he ought to have been tried separately from Mr. Kerkman. We reject both contentions.

## I

In 1979 Messrs. Fischl and Kerkman participated in the organization of two thinly capitalized corporations, Lake-Link Transportation Company (sometimes called "LLTX") and Upper Peninsula Shipbuilding Company ("UPSCO"). Both men were officers of both corporations.

The co-founders hoped initially that LLTX would be able to secure a contract from the State of Michigan for the operation of marine vessels on which railroad cars could be transported across Lake Michigan. No such contract was obtained, but in June of 1979 the men succeeded in negotiating a $35.5 million contract with the State's Transportation Commission for the construction by UPSCO of a tugboat and four "forebodies," or barges.

The construction contract, which was formally signed on July 3, 1979, called for an initial advance of $3.5 million, to be paid to UPSCO (subject to the appropriation of funds by the legislature) on or about October 1, 1979. Notwithstanding this provision, the State had indicated in a letter dated June 28, 1979, that on the date the contract was to be signed the State would hand-deliver to Mr. Fischl, as Secretary-Treasurer of UPSCO, a check payable to the company in the amount of $1 million.

Curtis R. Witte, argued, Grand Rapids, Mich. for defendant-appellant.

Thomas J. Gezon, Asst. U.S. Atty., Grand Rapids, Mich., Don Davis, argued, for plaintiff-appellee.

Before MERRITT, JONES and NELSON, Circuit Judges.

The letter stated "[w]e understand that the proceeds will be used for the down payment on engines for the tugboat and for general administrative expenses of the shipyard."

The State's $1 million dollar check was, in fact, delivered to Mr. Fischl on July 3, 1979, the legislature having made a special appropriation for that purpose. It was stipulated at trial that Mr. Fischl opened an account for UPSCO at a Grand Rapids bank, deposited the $1 million, and arranged for a significant part of the money to be wired to a German bank for the account of a Krupp subsidiary from which UPSCO planned to buy the engines for the tugboat.

The funds sent to Krupp ostensibly represented a straightforward down payment on the purchase price of the engines. There was evidence from which the jury could reasonably have found, however, that more than half the down payment was promptly returned to UPSCO's sister company, LLTX, as a kickback, and that UPSCO had agreed to increases in both the amount of the down payment and the total price for the engines in order to obtain a larger kickback, or "commission," than Krupp would otherwise have been willing to pay.

It would have been customary for the buyer of Krupp engines to pay only 10% of the purchase price as a down payment, and that is what Krupp proposed in negotiating sessions conducted with Messrs. Fischl and Kerkman in Michigan early in June of 1979. Those negotiations led to the issuance of a letter of intent dated June 6, 1979, typed by Mr. Fischl and signed by Mr. Kerkman as President of LLTX, memorializing an intent to place an order for the engines at a total price of 3,240,000 Deutschmarks, of which 10% would be paid with the order as a down payment. On June 29, 1979, however, Mr. Fischl sent the State a letter enclosing an offer in which Krupp proposed to sell the engines to UPSCO at a price of DM 3,536,000, with a down payment of 20%. Mr. Fischl's letter to the State explained that "[t]he 20% down payment represents approximately $390,000," and went on to say "[t]he remaining $610,000 [of the State's projected $1 million advance] will be used for working capital for UPSCO...."

The final numbers were negotiated by Mr. Kerkman with Krupp in Germany at the beginning of July. The deal he made, as the jury could reasonably have found, was that Krupp would ostensibly charge DM 3,985,136 for the engines, receiving a "down payment" from UPSCO of DM 781,-136, or slightly under 20%. On receipt of this "down payment," Krupp would return DM 425,136 to UPSCO or its designee, thereby reducing the net price of the engines to DM 3,560,000. The size of the "down payment" was arrived at by taking 10% of the latter amount and adding the agreed kickback to that 10%. The "down payment," in other words, was computed (in Deutschmarks) as follows:

|  | |
|---:|---|
| 356,000 | (10% of the true price) |
| + 425,136 | (amount to be kicked back) |
| 781,136 | (amount of total "down payment.") |

Krupp was not willing to part with the DM 425,136 until it had actually received the DM 781,136; the former sum was to come out of the latter, and the latter was to come out of the initial $1 million payment by the State.

Mr. Kerkman spoke to Mr. Fischl by telephone from Germany twice during the first week of July, 1979. In the first call he gave Mr. Fischl the figures he had arrived at with Krupp and asked Fischl to transfer the "down payment" of DM 781,-136. In the second call, placed a day or two after the first, he asked Mr. Fischl to expedite the transfer, explaining that he was to bring a check back to the United States with him and that the "down payment" had to be in Krupp's hands before he could leave Germany.

Mr. Fischl received the State's $1 million check on July 3, as noted, and instructed the bank in which he deposited the funds to take out DM 781,136 (approximately $428,-000) and transfer that amount to Germany. The bank did so on July 5, as directed by Mr. Fischl, using electronic communica-

tions in interstate and foreign commerce. On receipt of the DM 781,136, Krupp handed Mr. Kerkman two checks totaling DM 425,136 (approximately $233,000); the larger check was made out to LLTX, and the other (for DM 20,000) was payable to Kerkman personally. Mr. Kerkman returned to the United States on July 6 and turned over the larger check to Mr. Fischl, who took it across several state lines and deposited it in an account he opened for LLTX in Chicago. The remaining DM 20,000 was also deposited ultimately in an LLTX account.

The contract between UPSCO and the State, the terms of which had been negotiated by Messrs. Fischl and Kerkman personally, contained a conflict of interest clause that prohibited UPSCO from entering into any contract or subcontract "in which any member, officer, or employee of [UPSCO] during their tenure or for one (1) year thereafter has any interest, direct or indirect." The contract contained a termination clause giving the State the right to terminate the contract in the event of a substantial violation of this or any other term of the contract. It would have been reasonable for the jury to conclude that the arrangement with Krupp gave Messrs. Fischl and Kerkman an "interest" in UPSCO's contract with Krupp that would have justified termination of the State's contract with UPSCO.

The contract also made the State's initial $3.5 million advance payment contingent upon UPSCO's providing the State

> "details of ... direct or indirect construction expenditures and commitments made through the approximate date of the advance payment. Said details shall be supported by sufficient documentation to demonstrate that actual expenditures and commitments are, at least, equal to the amount of the advance."

In addition, the contract provided that UPSCO should either furnish a $33.5 million lien bond "or in lieu thereof permit [the State] to periodically audit records of payments to contractors, subcontractors and suppliers." It was not supposed that the company could obtain such a bond, and UPSCO never did so.

On September 5, 1979, several weeks before the State was to pay UPSCO the balance of the $3.5 million advance called for by the contract, an official of the State sent a letter to UPSCO referring to the $1 million paid in July and asking UPSCO to furnish "a brief outline of the expenditures thus far...." Such an outline was submitted to the State on September 11, 1979, when UPSCO invoiced the State for the remaining $2.5 million. The invoice was supported by documentation that included a "Schedule of Expenditures" on which $428,250 was listed as "Direct Expenditures" for "Engines." The documentation also included a letter from Krupp to UPSCO's auditors, Ernst & Whinney, confirming that UPSCO had a contract for the purchase of engines at a total price of $2,253,897.81, on which Krupp had received a down payment of $428,257.81 (DM 781,-136) on July 5, 1979. The text of the letter had been furnished to Krupp by Mr. Fischl. Ernst & Whinney knew nothing of the kickback, and thus did not know that the net down payment retained by Krupp was less than half the amount claimed in the letter, and did not know that the true price to UPSCO, net of the kickback, was some $233,000 less than the amount it was asserted to be.

Another document submitted to the State in support of UPSCO's request for the remaining $2.5 million was a letter in which Ernst & Whinney advised the State that it had reviewed UPSCO's expenditures and commitments and found that they exceeded the $3.5 million specified in the advance payment section of the contract. The State was not satisfied with Ernst & Whinney's statement, and sent its own auditors out to review the company's documents with Mr. Fischl, who was UPSCO's chief financial officer. The purpose of that visit, as one of the State's auditors testified, was "mainly to look at the expenditures to see that the expenditures totaled a million dollars...."

Based on the information he obtained in his visit with Fischl, the auditor concluded that UPSCO's "expenditures" (including an amount retained in the company's bank account) exceeded $1 million by $25,945.33. An internal State audit document specifically notes that "[t]he $428,202.96 expended as a down payment on the engines is acceptable to us."

The auditor testified that he "found no unusual payments made by UPSCO that could be considered questionable," and he said Mr. Fischl did not tell him that any money had been received back from the Germans. Such information would have been of interest to the auditor, "because that would have lowered the level of expenditures." The auditor was directly told "that Charles Kerkman was not a U.S. representative of the German diesel engine manufacturer."

Persuaded as a result of the auditor's visit with Mr. Fischl that "[t]he engine deposit, bank deposit and operating expenses total more than $1,000,000," as one of the State's contemporaneous records says, the State paid UPSCO $2.5 million on October 11, 1979. Had the auditors known of the $233,000 kickback, they would not have concluded, as they did, that the down payment for the engines, the amount spent on operating expenses, and the amount left in UPSCO's bank account added up to more than the $1 million advanced to UPSCO in July.

The office of the State Senator Joseph Mack, in whose district the tugboat and barges were to be built, had worked with Messrs. Fischl and Kerkman, the State Department of Transportation, and the legislature to help UPSCO obtain the contract for the vessels in the first place. In the fall of 1979 Senator Mack's office became aware of "rumors" concerning UPSCO's operation that might have jeopardized further legislative funding of the project. Messrs. Fischl and Kerkman repeatedly assured Sen. Mack's office that there was no wrongdoing and that no "commissions" or kickbacks had been received. On the strength of those assurances, the Senator's staff worked out a letter, discussed with Fischl and Kerkman in advance, posing a series of questions that UPSCO agreed to answer in writing. It was contemplated that these questions and answers would be circulated to individual legislators to help convince them that they ought to continue to support the project.

With respect to the engines ordered by UPSCO, Senator Mack's letter asked, among other things,

"B.  ... What is the total cost and how much of a deposit was put down?

"C.  Is Mr. Kerkman of UPSCO an agent for the engine manufacturer and if so, did he receive any commission on the sale of the engines to UPSCO?"

UPSCO's answers, dated November 21, 1979, read as follows:

"B.  ... A 20% deposit accompanied the order in accordance with recognized practice for this product type. This deposit was 781,136 DM; the remainder will be due on delivery. The total cost of the engines is $2,293,902.

"C.  Mr. C.H. Kerkman is not acting as an agent nor will he receive any commission on the sale of these engines...."

Although Sen. Mack and his staff believed these answers to be truthful, the jury was entitled to find the answers false. The "recognized practice" was for buyers ordering Krupp engines to pay a deposit of 10%, as the jury could have found, not 20%. UPSCO's actual deposit was DM 356,000, not DM 781,136, and the letter overstated the total cost of the engines by the difference between those two figures. That difference (DM 425,136) represented a "commission" that a corporation controlled by Messrs. Kerkman and Fischl had received on the sale of the engines, contrary to the representation that Mr. Kerkman would receive no commission.

UPSCO's false representations—over 100 copies of which were distributed to individual legislators—were intended to encour-

age the legislature to continue to appropriate funds for the construction of the vessels. In the opinion of Senator Mack's staff, further funding would not have been forthcoming had the existence of the kickback been known. The record is silent as to whether there were any appropriations in addition to the original $3.5 million, but counsel informed us at oral argument that the appropriations for this project ultimately reached a total of some $40 million. UPSCO eventually went into bankruptcy, and according to the trial court the State never did get its completed vessels.

## II

■ Mr. Fischl's principal contention, on appeal, is that he intended no harm to the State, and thus could not have devised the "scheme or artifice to defraud" that is an essential element of the crime of mail fraud under 18 U.S.C. § 1341. He points out that the construction contract provided for the payment to UPSCO of a fixed price, not dependent on the amount UPSCO actually paid for the engines, and he says the State could not have been hurt by the kickback. If not designed to harm anyone, he contends, the kickback scheme amounted, at most, to a victimless crime; and as far as the mail fraud statute is concerned, he suggests, there can be no actual crime without an actual victim. *Epstein v. United States*, 174 F.2d 754 (6th Cir.1949).

As we read the case law, however, it confirms what common sense suggests: that as an active participant in a scheme intended to induce the State to part with large sums of money on the basis of material misrepresentations of fact—a scheme that involved the use of wire and mail communications to obtain the money and to cover up the deception—Mr. Fischl intended to defraud the State in a very real and active sense, and thus violated the criminal laws notwithstanding that he also contemplated that UPSCO would deliver the vessels for the agreed contract price. Mr. Fischl intended to cheat the State's transportation officials out of information to

which they were entitled, under the contract, and which would have warranted their terminating the contract at or close to its very inception. He intended to cheat the State's legislature out of information which, if known, would have killed the appropriation of millions of dollars for the UPSCO project. Mr. Fischl's intentions were quite sufficient, in our view, to make his conduct criminous.

■ As this court had occasion to explain in *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979):

> "... the scheme to defraud element required under § 1341 is not defined according to a technical standard. The standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" (Citations omitted.)

In the same vein, a panel of the Court of the Appeals for the Fourth Circuit said in *United States v. Mandel*, 591 F.2d 1347 (4th Cir.1979), that "the mail fraud statute generally has been available to prosecute a scheme involving deception that employs the mails in its execution that is contrary to public policy and conflicts with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing." 591 F.2d at 1361. The panel went on to declare that:

> "... fraudulent non-disclosure or concealment of facts may be evidence to support a conviction under the mail fraud statute ... when there has been a fraudulent statement of facts, or a deliberate concealment thereof, to a public body, in order to receive a benefit by action of the public body. The scheme to defraud can in such a case be said to encompass not only the receipt of the illicit benefit, but also the deprivation of the public of the right to have its officials act on other than false information." 591 F.2d at 1364.[1]

1. For reasons not pertinent here, the panel concluded that the conviction of Governor Mandel

*Epstein v. United States,* 174 F.2d 754 (6th Cir.1949), the case on which Mr. Fischl relies most heavily, did not involve fraudulent misrepresentations to a public body or anyone else. The defendants in *Epstein,* directors of a brewing company that purchased supplies from other companies in which the defendants had an interest, were indicted for allegedly selling supplies to the brewing company "at greatly increased and excessive prices ... to the financial loss and detriment of the stockholders thereof." 174 F.2d at 760. This court held that there was "a fatal variance between the allegations in the indictments and the proofs," 174 F.2d at 763, the evidence adduced at trial having shown that the supplies purchased by the brewing company were priced at or below market. It was against this background that this court held that the government had failed to make the requisite showing of "active or actual fraud."

A subsequent decision of this court, *United States v. Schilling,* 561 F.2d 659 (6th Cir.1977), demonstrates, if any demonstration be needed, why *Epstein* is not controlling here. Unlike *Epstein,* the *Schilling* case did involve false representations, and as in the case at bar, the false representations were made to public officials. The defendants in *Schilling* contracted to sell property to a public authority that could not purchase it without the approval of a legislative body of which one of the defendants was a member. The defendants falsely represented that the member in question had divested himself of his interest in the property. This court held it was error to dismiss the indictment: notwithstanding that the property might have been worth every penny that the public authority paid for it, there would be a criminal violation if, as alleged in the indictment, the members of the legislative body had been caused "to surrender their right to object to the sale." If the defendants defrauded the legislators of their "right to object," they committed

"actual fraud" within the meaning of *Epstein.*

Applying the logic of *Schilling* to the case at bar, it is clear that at the very least Mr. Fischl defrauded the State of its right to terminate the UPSCO contract. Untruthful "lulling letters" of the sort for which Mr. Fischl was responsible, and which in this case induced the State to continue funding the UPSCO project, have repeatedly been held sufficient to support mail fraud convictions. *United States v. Ashdown,* 509 F.2d 793, 800 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975); *United States v. MacClain,* 501 F.2d 1006, 1012 (10th Cir.1974).

There is nothing to the contrary in *United States v. Rabbitt,* 583 F.2d 1014 (8th Cir.1978), where an official who accepted commissions on the award of public contracts was found not guilty of mail fraud under 18 U.S.C. § 1341 because it was not he who awarded the contracts, and because the officials who did award them did so on merit. Neither is Mr. Fischl entitled to prevail on the basis of anything in *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1179 (2d Cir.1970) (salesmen's misrepresentations to prospective customers did not constitute a scheme to defraud where "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain"); *United States v. Lemire,* 720 F.2d 1327, 1337 (D.C. Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984) (employee of investor-owned company held not to have violated the wire fraud statute by failing to disclose a conflict of interest that he could not reasonably have contemplated would cause the company some concrete business harm); *United States v. Ballard,* 663 F.2d 534, 541 (5th Cir.1981) (employees of commercial companies held not to have violated the mail fraud statute by concealing information they had no reason to believe "would lead a reasonable employer to change its business conduct"); or *United*

should be vacated and the case should be remanded for a new trial. On rehearing by the court en banc, the conviction was affirmed by an equally divided court. 602 F.2d 653 (4th Cir.1979). Certiorari was denied, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).

*States v. Dixon*, 536 F.2d 1388, 1400 (2d Cir.1976) (violation of the SEC's proxy rules did not constitute mail fraud where there was no evidence that the violation would have been material to a stockholder).

## III

The trial court's refusal to sever Mr. Fischl's trial from Mr. Kerkman's was well within the court's discretion. A trial court's denial of a motion to sever will only be disturbed on appeal if the defendant "clearly" demonstrates "compelling" prejudice (*United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir.1985), *cert. denied, Graewe v. U.S.,* ⸺ U.S. ⸺, 106 S.Ct. 826, 88 L.Ed.2d 798, ⸺ U.S. ⸺, 106 S.Ct. 828, 88 L.Ed.2d 800, ⸺ U.S. ⸺, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986), *United States v. Warner*, 690 F.2d 545, 552 (6th Cir.1982)), and this Mr. Fischl has failed to do. He may not have been the mastermind of the kickback scheme, but he did not have to be. *United States v. Stull*, 743 F.2d 439, 442 (6th Cir.1984), *cert. denied,* ⸺ U.S.⸺, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). His participation in the kickback scheme and coverup was inextricably intertwined with Mr. Kerkman's, and we think it was eminently appropriate for the two men to be tried together. The discrimination the jury showed in convicting Mr. Fischl on some counts and acquitting him on others strengthens that conclusion, but is not essential to it. The joinder did not prevent Mr. Fischl from receiving a fundamentally fair trial, and so we would have held even if he had been convicted on all counts.

## IV

Having carefully considered all of the rather extensive evidence to which the parties directed our attention, including evidence that Mr. Fischl willfully and knowingly signed a false corporate income tax return for LLTX and conspired with Mr. Kerkman to defraud the United States of income taxes due it, we are firmly convinced that Mr. Fischl was properly convicted on each of the counts of which the jury

found him guilty. The judgment of conviction is AFFIRMED.