9 F.3d 107
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Robert D. FISCHL, Petitioner-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
 No. 92-2092.
 United States Court of Appeals, Sixth Circuit.
 Oct. 25, 1993.
 
 Before: MERRITT, Chief Judge; JONES and NELSON, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 Petitioner-Appellant Robert D. Fischl appeals the district court's denial of his Motion to Vacate Sentence under 28 U.S.C. Sec. 2255 and his Motion to Disqualify the Honorable Richard A. Enslen from considering his case pursuant to 28 U.S.C. Sec. 455. Fischl raises a host of arguments from ineffective assistance of counsel to insufficiency of the evidence. We find none of them persuasive and affirm the district court in all respects.
 
 I.
 
 2
 The factual background of this case is somewhat complex. It is set forth in detail in the published opinion adjudicating Fischl's direct appeal, United States v. Fischl, 797 F.2d 306 (6th Cir.1986) (Fischl I ); we summarize here for the sake of brevity. In 1979, Fischl and Charles H. Kerkman organized two thinly capitalized corporations, Lake Link Transportation Company ("Lake Link") and Upper Peninsula Shipbuilding Company ("UPSCO"). They negotiated a $35.5 million contract with the Michigan Department of Transportation ("Department") for the construction by UPSCO of a tug boat and four barges. That contract called for an advance of $3.5 million by October 1, 1979. As part of that advance, the Department agreed to deliver a check payable to UPSCO in the amount of $1 million on July 3, 1979 (the day the contract was to be signed) to be "used for the down payment on engines for the tugboat and for general administrative expenses of the shipyard." The contract contained a conflict-of-interest clause that prohibited UPSCO from entering into any contract or subcontract "in which any member, officer, or employee of [UPSCO] during their tenure or for one (1) year thereafter has any interest, direct or indirect." The contract also contained a termination clause giving the Department the right to terminate the contract in the event of a substantial violation of any term of the contract. The Department's initial $3.5 million advance payment was contingent upon UPSCO's providing the Department with "details of ... direct or indirect construction expenditures and commitments made through the approximate date of the advance payments." UPSCO also was required to support these details "by sufficient documentation to demonstrate that actual expenditures and commitments are, at least, equal to the amount of the advance."
 
 
 3
 On June 29, 1979, Fischl gave the Department a letter requesting the $1 million advance, along with a purported quote from MaK Machinenbau ("MaK"), a German manufacturer of boat engines, claiming that MaK needed a 20% downpayment for the engines it would manufacture for the project. That quote apparently was a forgery, since MaK's original quote requested only a 10% downpayment.
 
 
 4
 Meanwhile, Kerkman flew to West Germany to close the deal for the engines with MaK. During these negotiations, Kerkman solicited money from Geunter Kuehl, a representative of MaK, to fund the fledgling Lake Link and UPSCO. Kuehl agreed to give Kerkman 425, 136 Deutschmarks ("DM") and to add this amount to the engine order. Thus, the final "purchase price" of the engines was 3,985,136 DM, which included the 425,136 DM requested by Kerkman.
 
 
 5
 The parties signed the contract and the Department advanced the $1 million as planned. Of the $1 million received, Fischl transferred 781,136 DM ($428,250, 19.6% of the "purchase price") to MaK as a "downpayment." MaK then issued two checks totalling the 425,136 DM requested by Kerkman; both checks were eventually deposited into Lake Link accounts. Most of this money was eventually used to purchase vessel drawings for Lake Link and UPSCO. The plans were a valuable asset which Kerkman and Fischl's young companies needed for this and future ventures.
 
 
 6
 Before the Department paid the remaining $2.5 million of the advance payment, it requested from UPSCO a brief outline of expenditures incurred. UPSCO submitted a "schedule of expenditures" on which $428,250 (781,136 DM) was listed as "direct expenditures" for "engines." This document also included a letter from MaK to UPSCO auditors that confirmed that UPSCO had a contract for the purchase of engines at a total price of $2,253,897.81 on which MaK had received a downpayment of $428,257.81 (19.0% of $2,253,897.81). The text of the letter had been furnished to MaK by Fischl. The net downpayment retained by MaK was in fact less than half the amount claimed in the letter, and the true price of the engines to UPSCO was approximately $233,000 less than the amount asserted.
 
 
 7
 The Department, not satisfied with UPSCO's outline of expenditures, conducted its own audit. The auditor concluded that UPSCO's expenditures had exceeded $1 million and found no unusual payments made by UPSCO. However, Fischl did not tell the auditors that any money had been kicked back from MaK. Following the audit, the state paid UPSCO the remaining $2.5 million. After spending approximately $40 million of the State of Michigan's money, UPSCO went bankrupt, never having completed the tug boat or a single barge.
 
 
 8
 On January 30, 1984, Fischl and Kerkman were indicted in the United States District Court for the Western District of Michigan in a twelve-count Indictment. Counts One, Two, Three and Four charged both defendants with wire fraud; Counts Five and Six charged defendants with mail fraud; Counts Seven and Eight charged both defendants with knowing transportation in foreign and interstate commerce of checks which had been taken by fraud; Count Nine charged both defendants with conspiracy to commit mail and wire fraud; Count Ten charged Kerkman with submitting a false income tax return; Count Eleven charged Fischl with submitting a false tax return; and Count Twelve charged both defendants with conspiracy to impede the functioning of the IRS.
 
 
 9
 After indictment and before trial, Fischl moved to sever his trial from that of Kerkman. His motion was denied. On the first day of trial, August 20, 1984, he renewed his motion to sever. His motion was again denied. From August 22, 1984 to September 11, 1984, a jury heard the government's evidence against both Fischl and Kerkman. At the close of the government's proofs, both defendants moved for judgments of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The district court denied the motions except for Kerkman's motion as to Count Ten, which was granted.
 
 
 10
 Then, apparently by a flip of the coin, it was determined that Fischl would present his defense first. Counsel for Fischl then stated, "Your Honor, pursuant to my advice and recommendation, Mr. Fischl has elected to rest with the record being what it is. We will not put in any evidence." J.A. at 878. The case was thus closed as to United States v. Fischl. See id. at 879.
 
 
 11
 Kerkman then began to testify in his own defense. Before he got very far, however, trial counsel for Fischl raised the concern that "the jury should not consider this evidence as it relates to Mr. Fischl." Id. at 883. A recess was then called, during which counsel for both sides spoke with the trial judge in chambers. Fischl, who was in attendance, filed an affidavit stating his account of what happened:
 
 
 12
 ... [T]he Court then advised us that he had located fourteen cases that "support bifurcation at this juncture;"
 
 
 13
 ... [T]he Court then asked Mr. Daavetilla [counsel for Fischl] whether his motion for severance was "still on the table;"
 
 
 14
 ... Mr. Daavetilla, who was sitting in a chair in front of me, immediately stood up, half-way, with his right arm and hand raised and his back to me, and said, "Yes, your Honor."
 
 
 15
 ... [A]s we re-entered the court room, I asked Mr. Daavetilla what "bifurcation" meant, and asked the import of what had just happened;
 
 
 16
 ... [H]e then advised me that the Court had granted our severance motion. I then asked him why we wanted a severance at this late date, and he told me that he was afraid that if he did not accept the Court's offer, I would waive any future right to raise on appeal the Court's failure to grant severance.
 
 
 17
 ... I expressed my concern for his decision not to put on any defense, and he told me, "Don't worry about it, it won't hurt you. They don't have a case."
 
 
 18
 Id. at 175-1 [sic]. Thus on that same day, September 18, 1984, the district court decided to submit Fischl's case to the jury without any more testimony being heard in United States v. Kerkman.
 
 
 19
 The jury convicted Fischl on Counts Five, Six, Eight, Nine, Eleven and Twelve, and found him not guilty with respect to the remaining counts. He was sentenced on November 20, 1984. The district court sentenced him to one year of imprisonment on Counts Five, Six, Eleven and Twelve (to run concurrently); five years of probation, a fine of $10,000, and restitution in the amount of $232,719.45 (the amount of the aforementioned kickback) on Count Eight; and five years of probation (to run concurrently with the sentence imposed on Count Eight) on Count Nine. Fischl directly appealed. In Fischl I, we affirmed the convictions July 30, 1986.
 
 
 20
 Fischl filed a Motion to Vacate Sentence and a Motion to Disqualify the Honorable Richard A. Enslen in the United States District Court for the Western District of Michigan on January 30, 1991. Fischl was no longer in prison but was serving the last few weeks of his five-year probationary term. (At present, Fischl is no longer on probation and is not in custody.) The district court denied both motions without a hearing on August 20, 1992.
 
 II.
 
 21
 Fischl raises numerous arguments on appeal. He claims he received ineffective assistance of counsel at trial which prejudiced his case, and that the district court erred by ruling on this issue without an evidentiary hearing. He contends he was denied due process when his case was severed from Kerkman's on the first day of Kerkman's defense, and that a hearing was required on this issue as well. He asserts that the prosecutor knowingly used false testimony at trial, tainting evidence essential for his conviction, and that his counsel's failure to recognize and raise this issue supports his claim of ineffective assistance. Fischl further contends that the restitution order entered against him is ultra vires, that the sentencing court relied on a misreading of trial testimony, and that the district court should be disqualified from any further consideration in this case. We reject each of these arguments.
 
 A. Ineffective Assistance of Counsel
 
 22
 On appeal, the district court's determination of a claim of ineffective assistance of counsel is reviewed as a mixed fact-law question. Thus:
 
 
 23
 The ... court's findings as to what was done or not done, and under what circumstances, are entitled to a presumption of correctness. On the other hand, the conclusion to be drawn from that conduct regarding the effectiveness of counsel's assistance is legal in nature.... [B]ecause it is legal in nature, the ... court's determination that [the defendant] received effective assistance is open to our review ... limited only by the presumption of accuracy we must accord to its underlying factual findings.
 
 
 24
 Adams v. Jago, 703 F.2d 978, 980 (6th Cir.1983) (Section 2254 proceeding); see also Strickland v. Washington, 466 U.S. 668, 698 (1984) (holding ineffective assistance of counsel to be a mixed fact-law question and noting that factual findings of federal district courts on this score are subject to clearly erroneous standard of review).
 
 
 25
 Under the well-known, two-part test for evaluating a Sixth Amendment ineffective assistance of counsel claim put forth in Strickland, 466 U.S. at 687, a criminal defendant "must show both that his counsel's performance was deficient and that it prejudiced his defense." Chandler v. Jones, 813 F.2d 773, 781 (6th Cir.1987). Fischl claims that he agreed with trial counsel not to put on evidence after the government rested only on the assumption that Kerkman would testify and would aid his defense thereby. When, subsequent to resting and before Kerkman testified to anything material, Fischl's trial counsel acquiesced in (or reasserted the motion for) a severance and Fischl's case was sent to the jury, Fischl's assumption was not borne out in fact. Fischl essentially claims that trial counsel erred by not following through with the trial strategy depicted above, by not consulting him before acquiescing in (or reasserting the motion for) a severance, see Strickland, 466 U.S. at 688 ("From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."), by not pursuing strategic alternatives to a severance, and by failing to attempt to reopen the case after severance.
 
 
 26
 The district court judge (the same judge who tried the case initially) reviewed the relevant record and concluded that trial counsel's actions fell well within the "wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. In the district court's view, Fischl's Sixth Amendment claim failed to meet the first prong of the Strickland test. The alleged trial strategy of resting and relying on Kerkman for Fischl's defense was first made known to the world by Fischl some four years after Fischl's direct appeal failed. Cf. Malone v. United States, 299 F.2d 254, 256 (6th Cir.1962) (significant period of time between when a potential Section 2255 claim should have become known and when the claim is actually brought "raises a strong inference as to [its] invalidity"), cert. denied, 371 U.S. 863 (1962). Thereafter, trial counsel for Fischl was deposed and trial strategy was reviewed. Trial counsel claimed that the decision to rest without presenting evidence was discussed with Fischl and that Fischl himself made the decision not to testify and to rest. See J.A. at 455. In trial counsel's view, the government had put on a weak case and might have been "sandbagging" harmful evidence for rebuttal. Significantly, trial counsel also claimed that the trial strategy never was to rely on Kerkman to present Fischl's defense. Kerkman, in trial counsel's view, was too volatile and explosive a witness, and there was too much bad blood between Kerkman and Fischl going into trial to count on Kerkman for assistance. Trial counsel thought that even an unemotional Kerkman might give testimony harmful to Fischl on the tax charges. In short, trial counsel "was not relying on ... Mr. Kerkman to carry the ball for Bob Fischl." Id. at 457. This was, according to trial counsel, all discussed with Fischl. See id. at 458.
 
 
 27
 We agree with the district court. Trial counsel's decision to rest was reasonable, given the view that the government presented a weak case[1] and that the government might be "sandbagging." By Fischl's own affidavit, his counsel informed him of this assessment before the trial resumed in court following the conference in chambers. There was no consultation problem concerning the decision to rest without presenting a defense.
 
 
 28
 The decision to sever after resting also was reasonable given the anticipated damage that Kerkman could have done to Fischl's case. Fischl argues that his counsel had a duty to consult with him on this issue. Fischl did talk to trial counsel, however, before the district court announced on the record that it would "now in part grant [the] motion" to sever. J.A. at 891. If Fischl really did not want to sever midstream, he could have instructed trial counsel to withdraw the motion to sever or object if the district court decided to sever anyway. Fischl cites no authority for the proposition that, in this case, trial counsel was ineffective by not adequately consulting with him before agreeing to sever midstream. Furthermore, Fischl's belated assertion that, all along, he was relying on Kerkman for his own defense is so tenuous that his claim of ineffective assistance on grounds of lack of consultation before "abandoning" such a strategy seems contrived.
 
 
 29
 Fischl also contends that the district court erred by proceeding to rule on his Sixth Amendment ineffective assistance of counsel claim without holding an evidentiary hearing. Title 28 U.S.C. Sec. 2255 states that "[u]nless the motion [to vacate sentence] and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon." "A hearing is not necessary in cases where a Sec. 2255 motion 'is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case.' " United States v. Carbone, 880 F.2d 1500, 1502 (1st Cir.1989) (citation omitted).
 
 
 30
 Fischl suggests that an evidentiary hearing is required to determine whether or not the agreed-upon strategy at trial was to let Kerkman present Fischl's defense. An evidentiary hearing would add nothing to the inquiry relating to Fischl's ineffective assistance of counsel claim. First, whether or not the agreed-upon trial strategy included using Kerkman to provide Fischl's defense is a clear-cut conflict in testimony between Fischl and his counsel. Fischl claims that such was the strategy; trial counsel says it wasn't. Fischl does not tell us what more an evidentiary hearing possibly could show. Moreover, the relevant record, as expanded by the deposition of trial counsel, strongly suggests that Fischl's claim on this score cannot be taken seriously. From the beginning, Fischl (through counsel) put on the record his fear that Kerkman's testimony would prejudice Fischl's case:
 
 
 31
 In the present case, if co-defendant Kerkman elects to testify in his own behalf, we can only assume that his testimony will be consistent with his prior statements. If this is the case the pressure on defendant Fischl to abandon his privilege against self-incrimination so as to refute the accusations of his co-defendant will be overwhelming and irresistable [sic]. This extraneous pressure to forego precious Constitutional rights is impermissible and it can be avoided only by granting of a severance.
 
 
 32
 ....
 
 
 33
 ... With this air of hostility and personal animus, it is fair to conclude that if co-defendant Kerkman feels he is going down to conviction, he will attempt to drag defendant Fischl along with him. This is not a fair or equitable context within which to try the case against defendant Robert D. Fischl. To avoid this prejudicial setting, a severance should be granted.
 
 
 34
 J.A. at 31-33. The record suggests that Kerkman was considered an unpredictable witness who might well damage Fischl's case with respect to (at least) the tax charges. As the district court wrote:
 
 
 35
 Relying on Kerkman for a defense would have been a risky trial strategy, at least to this Court's thinking, and would constitute representation far more suspect under Strickland than resting. Trial counsel felt that the government had failed to prove knowledge and intent on the part of Fischl, partly because of a lack of specificity. Kerkman could have provided specifics. Also, the jury may have disbelieved Kerkman, given his admittedly volatile nature, and used that disbelief against Fischl.... [I]t might well have been irrational to have wanted Kerkman to provide the defense to Fischl, especially, when at the close of the government's proofs, the case looked so favorable to the defense.
 
 
 36
 J.A. at 223. The record indicates that Kerkman would not have helped Fischl's case and might well have hurt his case. Relying on Kerkman for Fischl's defense might well be considered so "risky" as to be "irrational." Id. Fischl's trial counsel presents the more objectively reasonable view, and Fischl alludes to nothing that might have arisen at an evidentiary hearing to discredit it. The hearing was properly denied.
 
 B. Due Process and Bifurcation
 
 37
 Fischl contends that the district court erred by, "sua sponte, " deciding to bifurcate the trials of Kerkman and Fischl midstream. He raises the claim that "to send Fischl's case to a jury that had heard twelve days of incriminating evidence against Co-Defendant Kerkman and nothing on behalf of either Kerkman or Fischl," Fischl's Br. at 19, violated his right to due process of law. We agree with the district court that this decision was made only with the consent of Fischl, in his presence, through counsel. The renewed motion to sever was granted only after the district court had confirmed that Fischl's motion to sever was still on the table. See J.A. at 888, 891. Second, on the merits of Fischl's due process argument, the district court concluded that "the case as it related to Fischl was completed at the time of the severance of the case against co-defendant." Id. at 213. We agree with the district court that Fischl cannot, in good faith, claim that his own due process rights were violated by not letting his jury hear Kerkman's defense.
 
 
 38
 Fischl continues to maintain in his Reply Brief that, though he moved for severance before the joint trial began, the decision to sever after the government presented its case against Kerkman and Fischl was made by the district court sua sponte. This sua sponte decision was merely "acquiesced in by counsel" for Fischl. Fischl's Reply Br. at 6. See J.A. at 474 (deposition testimony of trial counsel for Fischl) ("Well, first of all, I didn't renew the motion. At no time did I tell the Judge, 'Judge, I want a severance now.' That was the Judge's decision. He asked me whether or not the motion was still viable or whether we had withdrawn it, and I had indicated that the motion had not been withdrawn. And the reason for my comment that the motion had not been withdrawn was to protect the record."). Fischl also maintains that he was prejudiced by the midstream severance. Fischl's real bone of contention lies with the fact that the Kerkman/Fischl case was not severed at the outset. But we determined in Fischl I that "it was eminently appropriate for the two men to be tried together. The discrimination the jury showed in convicting Mr. Fischl on some counts and acquitting him on others strengthens that conclusion, but is not essential to it. The joinder did not prevent Mr. Fischl from receiving a fundamentally fair trial...." 797 F.2d at 313. In the instant appeal, Fischl is merely trying to assert once more his prior severance argument.
 
 
 39
 Fischl's objection to the fact that his jury was able to hear the government's case against Kerkman without hearing Kerkman's defense to it is without merit. The presentation of evidence against both Kerkman and Fischl saved judicial resources. See United States v. Horton, 847 F.2d 313, 317 (6th Cir.1988) ("There is a strong policy in favor of joint trials when charges will be proved by the same series of acts....") (citation omitted). When Fischl chose to rest without putting on any evidence, his case was closed. Any adverse inferences from the government's case against Kerkman were effectively quashed by the district court's instructions to the jury. Indeed, Fischl concedes that the jury was properly instructed not to consider Kerkman's case when evaluating Fischl's case. See Fischl's Reply Br. at 10. Furthermore, "we presume that the jury will be able to sort out the evidence applicable to each defendant and render its verdict accordingly." United States v. Blakeney, 942 F.2d 1001, 1011 (6th Cir.1991). In fact, we specifically found the presumption to exist in this case. Fischl I, 797 F.2d at 313. Whether or not the decision to sever midstream was sua sponte or on motion by Fischl's counsel, Fischl's due process argument fails.
 
 
 40
 Fischl's assertion of error because no evidentiary hearing was held on the issue of whether the severance was sua sponte or pursuant to a motion by counsel for Fischl must also fail. Even if the decision to sever/bifurcate was sua sponte, Fischl cannot be said to have been prejudiced by the decision for the reasons stated. Thus, since the "motion [to vacate sentence] and the files and records of the case conclusively show that the prisoner is entitled to no relief," 28 U.S.C. Sec. 2255, no hearing was or is required.
 
 
 41
 C. Government's Alleged Use of False Testimony
 
 
 42
 Fischl contends that the government's case against him consisted, in every material respect, of false testimony that the government knew was false. Absent such allegedly false testimony, Fischl claims, "no rational trier of fact would have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). Furthermore, the fact that many of the alleged falsehoods could have been discovered by trial counsel before the jury retired to deliberate,[2] in Fischl's view, adds to his claim that counsel was ineffective and that such ineffectiveness prejudiced his case. Fischl thus contends that both prongs of the two-pronged Strickland test are implicated and satisfied by the failure of trial counsel to "expose[ ] the Government's case as the tissue of lies that it is," Fischl's Br. at 25.
 
 
 43
 The district court quoted United States v. Shaid, 916 F.2d 984, 987 (5th Cir.1990), holding that "any purported error not of [constitutional or jurisdictional] magnitude may only be considered under a section 2255 motion if it could not have been raised on direct appeal and, if condoned, would result in a complete miscarriage of justice." J.A. at 225. The court held that Fischl had not raised his insufficiency-of-the-evidence arguments on direct appeal, and has not shown cause why he did not, thus obviating the need to address the merits of Fischl's contentions on this score. The court also considered the evidentiary arguments to be "unrelated to the claim of ineffective assistance of counsel." Id.
 
 
 44
 Fischl responds to these arguments along many lines. Concerning the district court's dismissal of his evidentiary claims on procedural grounds, he argues that the procedural "cause and prejudice" rule invoked by the district court does not apply to constitutional claims, and knowing use of false testimony implicates constitutional due process. Second, he contends that the alleged falsity of much of the testimony could not have been known prior to the direct appeal to this court because it was revealed during the retrial of co-defendant Kerkman which occurred after this court's opinion in Fischl I.
 
 
 45
 We have held that for a defendant to successfully assert that the conviction was obtained with the use of testimony that the prosecution knew was false, "the moving party must show that the statements were material, that they were actually false, and that the prosecution knew they were false." United States v. Hawkins, 969 F.2d 169, 175 (6th Cir.1992). Fischl cannot meet this burden. To avoid the procedural bar otherwise in effect due to his failure to raise this issue on direct appeal, Fischl relies heavily on the fact that some of the alleged material falsehoods could not have been known until after his direct appeal because the contradictions became apparent at the retrial of Kerkman. If it is true, however, that Fischl could not have realized the alleged falsity of the statements given at his own trial because of the inconsistencies revealed at Kerkman's trial, it is not clear why the government would have known of the inconsistencies earlier. The third prong of the Hawkins test is not met. Alternatively, if Fischl were aware of the use of false testimony at the time of trial or on appeal, the claim is not cognizable in this Sec. 2255 action. As the Seventh Circuit stated in Anderson v. United States, 403 F.2d 451, 454 (7th Cir.1968) (emphasis added):
 
 
 46
 The knowing use by the Government of perjured testimony in order to obtain a conviction would, if proved, be grounds under section 2255 for vacation of a conviction under circumstances such as exist here where the petitioners assert that they were unaware of the alleged perjury both at the time of the trial and the appeals.
 
 
 47
 See also Theodorou v. United States, 887 F.2d 1336, 1339 (7th Cir.1989) ("We have made it clear ... that a district court cannot reach the merits of an appealable issue in a section 2255 proceeding unless that issue has been raised in a procedurally appropriate manner.... As we have reiterated, a petition under section 2255 'will not be allowed to do service for an appeal.' ... These cases have clearly confirmed our position ... that a failure to raise constitutional challenges to a conviction on direct appeal bars a petitioner from raising the same issue in a section 2255 proceeding--absent a showing of good cause for and prejudice from the failure to appeal.") (emphasis added); see also Cross v. United States, 893 F.2d 1287, 1289 (11th Cir.1990) ("In a section 2255 federal habeas motion, a movant may not raise claims that were not presented on direct appeal unless he can show cause excusing his failure to raise the issues previously and actual prejudice resulting from the errors."). Fischl has not demonstrated sufficient "good cause."
 
 D. Restitution
 
 48
 Under 18 U.S.C. Sec. 3651 (repealed effective Nov. 1, 1987 and not applicable to offenses committed after that date):
 
 
 49
 While on probation and among the conditions thereof, the defendant--
 
 
 50
 ....
 
 
 51
 May be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had....
 
 
 52
 At sentencing, the district court ordered Fischl to make restitution payments to the State of Michigan in the amount of the illegal kickback at issue in the case, $232,719.45, as a condition of probation. This amount was later reduced to $116,359.50 after Kerkman, the co-defendant in the kickback case, was convicted. Fischl contends that the restitution order is ultra vires because the State of Michigan did not suffer "actual damages or loss" by the kickback scheme. The State of Michigan was obligated by the terms of the contract with UPSCO to pay $35.5 million whether or not Fischl and Kerkman received the MaK kickback. The district court refused to consider the merits of this issue because Fischl did not show good cause why the claims were not raised on direct appeal. Fischl contends that the trial court did not have jurisdiction under federal statutes to impose the restitution amount that it did, rendering its judgment ultra vires. Jurisdictional challenges to a conviction and sentence, he argues, are not waived by failure to raise them on direct appeal. See Shaid, 916 F.2d at 987 ("Any purported error not of [constitutional or jurisdictional] magnitude may only be considered under a Sec. 2255 motion if it could not have been raised on direct appeal and, if condoned, would result in a complete miscarriage of justice.") (emphasis added).
 
 
 53
 Assuming without deciding that Fischl's reading of Shaid is correct, we disagree with his conclusion on the merits. We rejected the argument he raises and found a cognizable economic loss from the kickback scheme in United States v. Kerkman, 866 F.2d 877, 880-81 (6th Cir.1989):
 
 
 54
 Kerkman argues that the jury could not have found the deprivation of any money or property because the Michigan Department of Transportation awarded a fixed price contract. Kerkman asserts that under this contract [UPSCO] was entitled to $35.5 million, so long as it completed [construction of four] barges [and a tugboat]. Therefore, the kickback cost Michigan nothing. Moreover, Kerkman argues that by hiding the kickback Michigan was deprived of only an intangible right to information.
 
 
 55
 This argument is without merit. In United States v. Fagan, 821 F.2d 1002, 1009 (5th Cir.1987), cert. denied, [484 U.S. 1005] (1988), a case decided after and in light of McNally[ v. United States, 483 U.S. 350 (1987) ], the Fifth Circuit concluded that [18 U.S.C. Sec. 1341, the mail fraud statute,] protects "economically material information" which an employee has reason to believe "would lead a reasonable employer to change its business conduct."
 
 
 56
 ....
 
 
 57
 [K]nowledge of the ... kickbacks was "economically material information" which might have induced the Michigan Department of Transportation "to change its business conduct." By hiding the kickback, Kerkman led the Department of Transportation to part with "its control over its money ... on the basis of a false premise" in several ways.
 
 
 58
 First, a reasonable jury could have found that Kerkman and Fischl obtained the first $1 million of the advance under false pretenses by misrepresenting the amount of the engine down payment. The contract called for an advance of $3.5 million by October 1, 1979. The Department of Transportation had agreed, however, to make $1 million available on July 3, 1979. It was led to believe that the money would be used for engine downpayments and administrative expenses. Instead, Kerkman and Fischl diverted a portion of the money to purchase a valuable asset, vessel plans, for Lake Link and [UPSCO]. Consequently, Kerkman and Fischl gained an important future economic advantage since future tugs would require use of the same plans. A reasonable jury could have found that Kerkman and Fischl misrepresented the amount of the downpayment in order to divert a portion of the advance to purchase this valuable asset for their companies. The Department of Transportation was thus deprived of a valuable property interest, namely, the use of $1 million for two months.
 
 
 59
 Kerkman and Fischl also arguably obtained the $2.5 million balance of the advance under false pretenses. They knew that the Department of Transportation was concerned about conflicts of interest. They also knew that under the terms of the contract disclosure of the kickback would entitle the Department of Transportation to cease payment of the advance and terminate the contract. When the Department of Transportation conducted an audit of the balance of [UPSCO] prior to payment of the balance of the advance, Kerkman deprived it of economically material information about the kickback. A reasonable jury could have concluded that Michigan would not have parted with its $2.5 million had Kerkman not deceived the Department of Transportation.
 
 
 60
 Given our finding in Kerkman of a cognizable "loss" to the State of Michigan as a result of the kickback scheme, an order of restitution on the basis of that loss was reasonable. While choosing the amount of the kickback as the amount of restitution may not have been perfect, it is less than the $2.5 million or more that might have been assessed. Fischl cannot demonstrate any prejudice from the asserted error.
 
 E. Reliance on Evidence Not in the Record
 
 61
 In sentencing Fischl, the district court noted that it felt that Fischl was not "entirely honest with himself or with [the court] about what has happened." J.A. at 937. The court went on to discuss whether or not Fischl really knew of the kickback scheme apparently concocted by Kerkman. In this context, the court stated:
 
 
 62
 Then as I recall it, Mr. Fischl received two telephone calls while Mr. Kerkman was in Germany. The first call as I recall it simply urged Mr. Fischl to expedite the down payment [to MaK]. If he hadn't been informed in the past, he was informed as to the exact amount of Deutschemarks necessary. A day or so later, while Mr. Kerkman was still in Germany, Mr. Kerkman made a second call to Mr. Fischl which Mr. Fischl today does not dispute with the exception of the content. The witness, and I believe it was Kuehl--it may not have been-- testified at the trial, and it was unrebutted that Mr. Kerkman told Mr. Fischl if you don't get the money to me I don't get the commission....
 
 
 63
 Id. at 939 (emphasis added). Fischl argues that Kuehl gave no such testimony. In fact, Fischl claims, Kuehl gave testimony which actually conflicted with the district court's recollections. Since, Fischl asserts, the sentence imposed was "admittedly ... premised," Fischl's Br. at 47, on this misreading of the trial record, Fischl's right to due process of law was violated. See Townsend v. Burke, 334 U.S. 736, 740-41 (1948) ("[W]e conclude that ... the prisoner was sentenced on the basis of assumptions ... which were materially untrue. Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand."). The district court dismissed this claim on procedural grounds, asserting that Fischl had failed to show good cause why he did not raise this claim on direct appeal.
 
 
 64
 Though addressing a different issue, the district court did respond to Fischl's assertion that the district court mischaracterized Kuehl's testimony:
 
 
 65
 Fischl notes several responses by Mr. Kuehl both during cross-examination and also during direct examination in support of his contention that the testimony cannot be fairly characterized as I had suggested at sentencing. However, Fischl's position is in reality just a difference of opinion regarding the credibility of the various statements made by Mr. Kuehl. Mr. Kuehl did in fact testify that "to the best of [his] recollection, Mr. Kerkman told Mr. Fischl that he is taking back a check, that he has to wait for the down payment." Trial Transcript at 1173. This statement, when combined with the evidence concerning Fischl's involvement in the engine purchase and the communications to auditors, the state, Senator Mack, and the I.R.S., certainly supports the interpretation that this Court gave at sentencing.
 
 
 66
 J.A. at 207-08.
 
 
 67
 Even if Fischl's claim is not barred on procedural grounds for failure to raise the issue on direct appeal when all the necessary facts were in existence, see Theodorou, 887 F.2d at 1339, the contested statement made at sentencing fairly paraphrases the record evidence. Even without Kuehl's testimony regarding the telephone call, there was sufficient evidence to indicate that Fischl really did know that Kerkman had illegally acquired the kickback checks. Furthermore, even if the district court's paraphrase was slightly inaccurate, it did not violate Fischl's right to due process at sentencing. Fischl has picked out one statement in a very lengthy summary by the district court of the evidence presented against him and claims that it misstates the record. On review of the entire record, the district court's interpretation of the testimony is not unreasonable. To assert a constitutional due process violation on the basis of an arguable but not unreasonable summary of a small slice of the evidence presented against Fischl is completely insufficient to warrant reversing the sentence imposed.
 
 F. Disqualification of the District Court
 
 68
 Fischl argues that, on "further consideration of this case," Fischl's Br. at 47, or "on remand," id. at 50, the case should be assigned to a different district court judge than the one who ruled on the motions. He claims that the district court judge has clearly demonstrated a "striking pattern of misperception," id. at 49. Since there will be no remand or further consideration of this case, we do not reach this issue.
 
 III.
 
 69
 The district court was correct in its treatment of the myriad issues raised by the defendant in this habeas proceeding. For the foregoing reasons, we conclude that Fischl has presented no meritorious grounds for vacating his sentence. We therefore AFFIRM the judgment of the district court in all respects.
 
 
 
 [1]
 Fischl himself "quite agree[d] with [trial counsel] that no rational trier of fact could have found proof of guilt beyond a reasonable doubt on the basis of the shoddy case the Government presented at trial." J.A. at 218-19
 
 
 [2]
 For example, some of the alleged falsehoods are supposedly obvious from a comparison of trial testimony and grand jury testimony/documentary evidence adduced at trial, see Fischl's Reply Br. at 12-13 & nn. 19, 21